UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 20-CR-10098 (WGY) |
| | ) | |
| BRIAN GILBERT, | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT BRIAN GILBERT'S SENTENCING MEMORANDUM**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND INFORMATION ..................................................................... 2

    A.    Professional Background ........................................................................ 2

    B.    Transition to eBay.................................................................................. 6

    C.    Medical Condition ................................................................................. 7

    D.    Post-Offense Rehabilitation .................................................................. 8

III.    A SIGNIFICANT GUIDELINE VARIANCE IS WARRANTED HERE......................... 9

    A.    Mr. Gilbert's Terminal Cancer Makes Any Period of Incarceration
        Significantly More Punitive. ................................................................ 10

    B.    This Offense Constitutes a Singular Departure from Mr. Gilbert's
        Lifetime of Upstanding Conduct and Public Service ................................. 11

    C.    Mr. Gilbert Fully Accepted Responsibility for His Conduct
        and Attempted to Assist the Prosecutors' Investigation ............................ 13

    D.    Deterrence Considerations Do Not Weigh in Favor of a
        Custodial Sentence................................................................................ 13

    E.    A Monetary Fine Is Unwarranted And Would Only Punish
        Mr. Gilbert's Innocent Family Members .................................................. 16

IV.    CONCLUSION................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*United States v. Bauer*,
No. 121CR003862TNM, 2024 WL 324234, (D.D.C. Jan. 29, 2024).........................................9

*United States v. DeRusse*,
859 F.3d 1232 (10th Cir. 2017) .............................................................................................11

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012).....................................................................................11

*United States v. Kravetz*,
948 F. Supp. 2d 89 (D. Mass. 2013) ......................................................................................10

*United States v. Willis*,
322 F. Supp. 2d 76 (D. Mass 2004) .......................................................................................10

*United States v. Yang*,
No. CR 23-100 (JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024) ...........................................9

**United States Sentencing Guidelines**

U.S.S.G. § 2A6.2(b)(1)(E) ....................................................................................................9

U.S.S.G. § 4C1.1.................................................................................................................9

U.S.S.G. § 4C1.1(a)(3).........................................................................................................9

U.S.S.G. § 5E1.2(d)(1).......................................................................................................16

U.S.S.G. § 5E1.2(d)(3).......................................................................................................16

U.S.S.G. § 5E1.2(d)(8).......................................................................................................16

U.S.S.G. § 5H1.4 ..............................................................................................................10

**Other Authorities**

*The eBay Cyberstalking Case: Mitigating the Compliance Risks of
Employee Misconduct,* Jones Day Talks podcast, October 2021..................................................14

## I.     INTRODUCTION

By now the Court is all too familiar with the horrifying offense conduct in this case. No matter how many times the facts are recounted, it is impossible to makes sense of the attack that eBay launched against the Steiners in the summer of 2019. Even harder to reconcile are the perpetrators with the crimes. Brian Gilbert's involvement in this criminal scheme is certainly contrary to the code of honor that he had subscribed to for the entirety of his working life. Five years later, it is still unfathomable to him that he played any role in it, let alone that he—a decorated and respected retired police captain for Santa Clara County Police Department— ultimately agreed to lie to law enforcement as part of the obstruction conspiracy. In his first and only foray into the corporate world, Mr. Gilbert completely lost his moral footing and made unforgiveable choices that still haunt him. Mr. Gilbert deeply regrets his behavior; that he did not stop and ask himself whether the sorts of tactics and techniques he was asked to use in his role at eBay were appropriate for a corporation to use against private individuals; and that he failed to appreciate the emotional devastation that his participation in the charged conspiracies caused to the victims in this case. After a career where the lines between right and wrong were obvious, Mr. Gilbert proved unable to navigate the shades of gray presented in the corporate world and ended up betraying his most deeply held values. Mr. Gilbert takes full responsibility for his poor decision-making.

Tragically, at the same time that Mr. Gilbert has been grappling with this criminal matter, he has also been engaged in a cancer battle with far more devastating consequences. Mr. Gilbert was diagnosed with Stage III colorectal cancer in 2020. At the time, he was 52 years old. After extensive chemotherapy and radiation, by late 2021 he believed he was cancer free. However, scans in October 2022 revealed a new cancerous tumor in his liver. During a planned surgery to

remove it, surgeons discovered that the cancer had spread to Mr. Gilbert's diaphragm, making the procedure too risky, and causing his doctors to upgrade him to Stage IV. There are no further curative options. Mr. Gilbert, now 56, has enrolled in an experimental clinical trial through the City of Hope with the understanding that, if he can withstand the treatments, they may prolong his life.

Both the government and the Court have been exceedingly gracious and flexible in granting continuances and otherwise affording Mr. Gilbert the time necessary to focus on his health. He is very appreciative of everyone's understanding. In particular, Mr. Gilbert is grateful to the United States for recommending a non-custodial sentence under these unique circumstances. Mr. Gilbert hopes that the Court will follow the parties' joint recommendation.

## II.     BACKGROUND INFORMATION

### A.  Professional Background

Mr. Gilbert grew up in the small, rural town of San Martin, California. His interest in public service and law enforcement began in high school when he joined his local police department's Explorer program in Morgan Hill. This program gave a taste of what a law enforcement career might look like, including participating in ride-alongs. Mr. Gilbert quickly realized that this was the career he wanted to pursue. By the end of high school, Mr. Gilbert had already earned a paid position with the Morgan Hill Police Department as a cadet, assuming the duties of a community service officer. After graduating from high school, he became a reserve officer, working part time for the Morgan Hill Police Department while earning his degree in Criminal Justice at California State University at San Jose.

Mr. Gilbert submitted his application to the Santa Clara Police Department ("SCPD") the very day he graduated from college. Of the more than 100 people in his testing group, Mr.

Gilbert was one of only three selected by the SCPD to attend the police academy. At the

academy, Mr. Gilbert distinguished himself as an outstanding candidate, finishing as one of the

top five officers in his class.

      Mr. Gilbert began his career at the SCPD as a uniformed patrol officer. Wanting to be

"the best of the best," Mr. Gilbert tested onto the department's Strategic Response Team (akin to

a SWAT team), where he would acquire additional training to handle high-stakes operations

threatening the safety of the public and other law enforcement officers. Being a member of this

elite tactical team required extreme dedication, which Mr. Gilbert embraced despite the danger to

himself. *See* Ex. 1, p. 19 (Letter of Steve Henry) ("Brian courageously faced risks that surpassed

what most police officers will ever experience, let alone be aware of. I know that many owe him

their lives.").[1] During his tenure on the Strategic Response Team, Mr. Gilbert received a

commendation for keeping an officer out of harm's way during a shooting in an occupied

apartment complex. *See* Ex. 2, p. 1 (2001 Distinguished Service Award).

      Mr. Gilbert next spent three years in an undercover narcotics unit, after which he was

promoted to sergeant. Based on his stellar record, tactical background, and expertise, he was

chosen to lead the Strategic Response Team and provide tactical training for the entire SCPD.

This was at a time when tactical training for all officers was undergoing a sea change in response

to the mass shooting at Columbine High School. Patrol officers began training to actively engage

in armed-shooter situations. Mr. Gilbert designed the SCPD's First Responder to Active Shooter

---

[1] Citations to exhibits 1 through 4 refer to exhibits attached to the Declaration of Miranda Kane
("Kane Decl."), filed concurrently herewith.  With the exception of Mr. Gilbert's letter to the
Court, Ex 1, p. 1, the letters comprising Exhibit 1 were authored in the Fall of 2022, when Mr.
Gilbert was still believed to be cancer-free and sentencing was scheduled for November 3, 2022.
Dkt No. 81.

Program, a cutting-edge approach that was later adopted by police departments throughout the State of California.

SCPD's Strategic Response Team excelled under Mr. Gilbert's leadership, winning numerous awards. Mr. Gilbert led his SRT team to medals for both team and individual challenges among U.S. western states and Canadian SWAT teams. Mr. Gilbert was also routinely entrusted with important protective assignments, including ensuring the safety of then-President George W. Bush when he visited the Bay Area in 2003. *See* Ex. 1, p. 9 (Letter of Amelia Gilbert). In 2004, Mr. Gilbert was honored for his ten years of service on the SCPD's Strategic Response Team, receiving a commendation for his dedication and commitment, and recognizing his service "with the highest sense of integrity, loyalty, respect, and professionalism." *See* Ex. 2, p. 2.

In 2006, Mr. Gilbert joined the Detective Bureau where he was assigned high profile cases in the Robbery/Homicide division. As a detective, he worked closely with the Santa Clara County District Attorney's office, where he was known for his professionalism, for going above and beyond what was asked of him, and where he was considered a "tremendous asset." *See* Ex. 3, p. 2 (Commendation Letter from Deputy District Attorney). Mr. Gilbert takes pride in the fact that he had a 100 percent solve-rate on robbery and homicide cases. Indeed, he was so well-respected that a neighboring county's police department, faced with its first homicide investigation in years, requested that Mr. Gilbert be temporarily cross-designated so that he could train its officers in how to properly run a murder investigation. *See* Ex. 2, p. 5 (2008 Certificate of Excellence).

Mr. Gilbert was hand-selected for the role of Intel Sergeant in 2008 based on his previous performance and reputation for integrity as an officer. In this role, Mr. Gilbert was assigned to

4

the Joint Terrorism Task Force, which included officers from every law-enforcement agency in the county, both federal and state. Eventually he was chosen to lead criminal public corruption investigations targeting SCPD's own officers. *See* Ex. 1, p. 17 (Letter of Greg Hill) (When confronted with allegations of an officer taking bribes, "our Chief didn't blink an eye before he assigned Brian to conduct the investigation"). In that capacity, Mr. Gilbert served as the lead investigator and case agent for a matter that resulted in a conviction after a hard-fought federal jury trial in the Northern District of California. Former Assistant United States Attorney Daniel Kaleba described Mr. Gilbert as possessing investigative skills "among the finest [he had] ever witnessed," noted his "high character" and "accurate moral compass," and reported his impression that Mr. Gilbert acted "with honor expected of a police officer, with respect for the rule of law, and with decency to the rights of the accused." *Id.*, at p. 12; *see also id.*, at p. 17 (Letter of Greg Hill) (recalling Mr. Gilbert's exceptional job investigating corruption by SCPD and Gilbert's anger that a police officer would engage in such conduct). Indeed, Mr. Gilbert received an Award of Excellence from the FBI for his work on this case, *see* Ex. 2, p. 4, and he was promoted to the rank of Lieutenant in 2012.

Later that year, Mr. Gilbert's outstanding police work and leadership skills were further recognized when he was selected to spearhead work on behalf of the SCPD on Levi's Stadium, the new home of the San Francisco 49ers. Mr. Gilbert was tasked with addressing all issues that could impact public safety and law enforcement at the 68,000-person capacity venue: design of the law enforcement command post within the stadium; operational plans to prevent terrorist attacks and criminal activity; safe ingress and egress for patrons; and even vehicle traffic approaching and leaving the stadium. Once again, the cutting-edge practices and procedures Mr.

Gilbert devised and implemented became an exemplar for other stadiums and venues across the country.

      After leading the Levi's Stadium effort and seeing it successfully through its first several years, including hosting Super Bowl 50 in 2016, Mr. Gilbert tested for a promotion to Captain. He took first place on the exam and became part of the Department's command staff. In that role, Mr. Gilbert was Patrol Division Commander, supervising over 100 officers.

      Mr. Gilbert's stand-out and unwavering commitment to public safety and law enforcement did not come without costs to his family life, however. His ever-growing responsibilities led to a high level of stress, and especially during his work on the stadium, he was frequently away from home for days at a time. *See* Ex. 1, p. 5. (Letter of Sepideh Gilbert). Mr. Gilbert and his wife began to discuss the possibility of his retirement from the police force and his taking a private sector corporate job instead.

### B.  Transition to eBay

      After the shooting at YouTube's headquarters in San Bruno in 2018, an eBay executive who Mr. Gilbert had worked with at Levi's Stadium approached him in 2019 to see if he would be interested in joining eBay's security team. Mr. Gilbert was eventually offered the position of Senior Manager of Special Operations.

      The job offer was an attractive one. Mr. Gilbert anticipated that it would call on the skills he had developed and excelled at as a police officer:  identifying safety threats and implementing systems and protocols to keep people and facilities safe.  Mr. Gilbert's responsibilities at eBay included executive protection, special events security, and safety at eBay's North American offices. PSR ¶ 7(f). Mr. Gilbert and his wife thought of this job opportunity as Mr. Gilbert's

"retirement job," in which he would have regular hours, which would allow him to spend time with his family. *See* Ex. 1, p. 6 (Letter of Sepideh Gilbert).

Unfortunately, the reality of the eBay position was quite different than what the Gilberts expected. Contrary to his understanding that the hours and demands would be lower than during his years of public service, Mr. Gilbert found that in this new job, he was constantly on call and that everything was treated as an emergency. He was bombarded with demands, having to respond to texts, calls, and emails at all hours of the day and night. His schedule became less predictable, and he had to take trips around the country with little notice. His family life, from which he had always drawn strength and purpose, and for which he had always been a reliable support, began to suffer. He stopped his longtime practice of attending church. Mr. Gilbert's wife observed that during his tenure at eBay, "there were no rules or safe boundaries; everything was okay as long as the company was growing and generating proper numbers." *Id.* Work pressures continued to mount, causing what his wife has characterized as "incredible stress" on their marriage. *Id.* Mr. Gilbert's wife observed that during his short-lived and tragic tenure in the private sector, Mr. Gilbert was like a different person – "Brian was just not the same man he was as a police officer." *Id.*

### C. Medical Condition

Mr. Gilbert was dismissed from his job at eBay in the aftermath of the events of August 2019. He has not been employed since. This is due largely to his cancer diagnosis, the attendant treatments, and their side effects. PSR ¶ 169. After two rounds of progressively more aggressive chemotherapy regimens, Mr. Gilbert and his family rejoiced when, at the end of 2021, scans showed that the tumor had completely disappeared. However, the celebration was short-lived. In October 2022, routine follow-up testing revealed a large cancerous tumor on the right side of his

liver, the placement of which made it inoperable. Rather than attempt to extricate the tumor, Mr.

Gilbert's medical team devised a plan to remove the entire right lobe of the liver. Unfortunately,

after opening his chest during surgery in late January 2024, the surgeons discovered that the

cancer had spread to Mr. Gilbert's diaphragm, making an already risky procedure too dangerous.

They aborted the surgical plan and literally stapled him back together. Mr. Gilbert awoke to the

devastating news that his cancer had been upgraded to Stage IV, and that he had exhausted his

curative options. Mr. Gilbert prefers not to dwell on his terminal prognosis, but he is acutely

aware that he is living on borrowed time. He has opted to participate in an experimental City of

Hope trial in hopes of prolonging his remaining time with his wife and three children, ages 15-

21.

The stresses attending Mr. Gilbert's cancer diagnosis and treatment have been

compounded by the fact that his family lost their health insurance when he was fired by eBay.

Ex. 1, p. 8 (Sepideh Gilbert letter). He and his wife have taken a home equity loan and borrowed

money from Mr. Gilbert's mother to help defray medical costs. PSR ¶ 187; Kane Decl., ¶ 6.

### D. Post-Offense Rehabilitation

The years following Mr. Gilbert's termination from eBay have been extremely

challenging, but Mr. Gilbert has managed to put his life back on the right course. He has

recommitted himself to the things that matter most: his wife, his children, his health, his core

values, and his faith. While his medical treatments have prevented him from working, he has

been volunteering regularly with the American Cancer Society and at his church as well as

engaging in community service projects. *See* Ex. 1, pp. 6, 20 (Letters of Sepideh Gilbert and

Patricia Chell). He has also taken over the homemaking and carpooling duties for his family and

is an active and involved parent to his children.

### III.    A SIGNIFICANT GUIDELINE VARIANCE IS WARRANTED HERE.

The importance of the Guidelines calculations is somewhat diminished if the Court is inclined to follow the parties' joint recommendation for a non-custodial sentence. However, the Court is still required to determine the applicable Guidelines range as one the factors for consideration in fashioning an appropriate sentence. At Criminal History Category I and an adjusted offense level of 21, the Guidelines range as determined by Probation is 37 to 46 months. *See* PSR ¶¶ 151, 155, 192.[2]

Notably, the PSR is silent regarding the applicability of the Zero Point Offender adjustment pursuant to U.S.S.G. § 4C1.1, which went into effect in November 2023, well after Mr. Gilbert entered his guilty plea. By virtue of having no criminal history points, Mr. Gilbert qualifies for an additional two-point offense level reduction unless the Court finds that he used a credible threat of violence in connection with the offense of conviction. *See* U.S.S.G. § 4C1.1(a)(3). "The inquiry turns on the actions of the defendant himself or herself, not the actions of others." *United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024); *see also United States v. Bauer*, No. 1:21-cr-00386-2 (TNM), 2024 WL 324234, at *4 (D.D.C. Jan. 29, 2024) ("Just as a district court must examine with particularity whether a defendant presents an 'articulable threat to an individual or the community' for the purpose of pretrial detention, it must also evaluate with particularity whether the defendant used violence or made credible threats of violence."). Mr. Gilbert does not dispute that part of the cyberstalking conspiracy against the Steiners included Twitter posts intended to harass and intimidate them. As

---

[2] Under his Plea Agreement, Mr. Gilbert reserved the right to argue against the application of the 2-level enhancement under U.S.S.G. § 2A6.2(b)(1)(E) (pattern of activity involving stalking, threatening, harassing, or assaulting the same victim). However, given that this Court imposed the enhancement against his co-defendants, Mr. Gilbert has opted to submit on this issue.

Probation notes in the Addendum to the PSR, the government maintains that the threatening

posts were authored, or at least approved, by Mr. Gilbert, whereas Mr. Gilbert avers that in many

instances, his co-defendants posted without his input. The Court must decide whether the

government has established by a preponderance of the evidence that the Zero Point Offender

reduction does not apply. If Mr. Gilbert receives the reduction, his adjusted offense level is 19

and the Guidelines range is 30-37. Whatever Guidelines range the Court finds, the parties agree

that a downward variance to time served is appropriate.

### A. Mr. Gilbert's Terminal Cancer Makes Any Period of Incarceration Significantly More Punitive.

The parties agree that Mr. Gilbert's terminal diagnosis and limited life expectancy

warrant a downward variance to a non-custodial sentence. A custodial sentence at this juncture

would not only require that Mr. Gilbert abandon the City of Hope trial (which is focused on

benefitting future patients battling late-stage cancer, not just Mr. Gilbert), but it would also likely

mean that he would spend his final months in prison, rather than with his wife and three children.

Because even a brief custodial sentence would be significantly more punitive for Mr. Gilbert

than for a healthy defendant, a variance is warranted. *See, e.g.*, *United States v. Kravetz*, 948 F.

Supp. 2d 89, 115 (D. Mass. 2013) (imposing non-custodial sentence given defendant's "grim

medical situation" and observing "prison could literally spell a death sentence" (quotation marks

omitted)); *United States v. Willis*, 322 F. Supp. 2d 76, 85 (D. Mass 2004) (imposing non-

custodial sentence in light of defendant's extremely poor health); *cf.* U.S.S.G. § 5H1.4 ("An

extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a

seriously infirm defendant, home detention may be as efficient as, and less costly than,

imprisonment."). Mr. Gilbert is grateful that the government is not advocating for a term of

imprisonment and asks that the Court follow the government's recommendation for a downward variance to a non-custodial sentence based on his dire medical condition.

### B. This Offense Constitutes a Singular Departure from Mr. Gilbert's Lifetime of Upstanding Conduct and Public Service.

There is no question that Mr. Gilbert's involvement in this offense represents a singular departure from a lifetime of righteous conduct. While it may be tempting to judge Mr. Gilbert more harshly for his crimes because of the stark contrast between the offense and his previous career as a police officer, his aberrant conduct should not negate a lifetime of good works, exemplary character, and public service. *See, e.g.*, *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (approving of variance based on "the extent to which the criminal conduct was out of character"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (granting large downward variance where the defendant's "personal history and characteristics starkly contrast with the nature and circumstances of his crimes").

This is underlined by Mr. Gilbert's supporters from his pre-eBay professional life. While Mr. Gilbert's former colleagues were unanimous in their shock and disappointment to learn that he was a criminal defendant in a cyberstalking case, they are nevertheless united in their view that he remains a "good person" and that this incident should not be the measure of the man. *See* Ex. 1, p. 12 (Letter of Daniel Kaleba) (saddened by what he views as "such a departure from the person" he had worked with in the past; yet affirming his belief "in the character and decency of Brian Gilbert" and asking the court to take into account the "good and important work he has done in the past" and Mr. Gilbert's continued potential, even after his conviction in this case, "to influence the world in a positive way in the future"); *id.*, at p. 17 (Letter of Greg Hill) ("This is not the Brian that showed me the right way to be a good police officer"); *id.*, at p. 11 (Letter of Bryan Sterkel) ("In his Government career Brian was sincere, level-headed, and straight forward.

His strongest assets were exactly what he did not demonstrate at Ebay:  He had a strong moral compass, thought for himself, and protected the troops by shouldering outside pressures so we could focus on our jobs"); *id.*, at p. 19 (Letter of Steve Henry) (describing Mr. Gilbert as an "inherently good person who momentarily lost his way" and describing Mr. Gilbert's conduct in this case as an "anomaly" and "certainly not a fair representation of who he is"); *id.*, at p. 13 (Letter of Darren Leininger) (continuing to measure Mr. Gilbert by his "lifelong commitment" to service, rather than by the lapse in judgment giving rise to the charges here); *id.*, at p. 18 (Letter of Scott Fitzgerald) (Mr. Gilbert's behavior here was "truly out of character").

Mr. Gilbert's family have likewise struggled to reconcile the man they know with his criminal conduct.  His wife, Sepideh, describes Mr. Gilbert's kindness, humility, and faithfulness, and that he puts others before himself, especially those under his command. Sepideh could see that Mr. Gilbert struggled to stay grounded in his position at eBay: "This was not the retirement job that we had all agreed on and Brian was trying to figure out how to juggle and make sense of everything and to keep everyone happy as the pressure and tension was getting worse. This chaotic situation caused incredible stress upon our marriage." *Id.*, at p. 6 (Letter of Sepideh Gilbert).  Sepideh describes Mr. Gilbert's conduct in this case as an "inexplicable lapse in judgment." *Id.*, at p. 8. She goes on to report that while Mr. Gilbert lost his way during his short time at eBay, "(s)ince leaving eBay, Brian has returned to the man I married." *Id.*, at p. 6.

This offense was an aberration for which Mr. Gilbert will forever be repentant and ashamed. His errors in judgment, while extremely harmful, were also very short-lived. He has since worked diligently to return to the honorable man he was for his entire life until the summer of 2019.

**C. Mr. Gilbert Fully Accepted Responsibility for His Conduct and Attempted to Assist the Prosecutors' Investigation.**

A downward variance is also appropriate in this case based on Mr. Gilbert's speedy acceptance of responsibility for his misconduct and his willingness to cooperate with the government. As soon as he learned of the criminal investigation, Mr. Gilbert voluntarily met with the government to discuss his involvement in the cyber-stalking and witness tampering conspiracies. Mr. Gilbert did not limit himself to the facts that he believed the government knew already. For example, he shared the fact that during his June 2019 trip to Natick, well before the charged conspiracy, he impulsively wrote "Fidomaster" on the Steiners' fence.[3] Likewise, he described the operation conducted at the Las Vegas airport to attempt to identify Fidomaster so that s/he would not disrupt the eBay Open. Mr. Gilbert's cooperation with the government marks the beginning of a return to the person he had been his entire adult life, a decision from which Mr. Gilbert has never looked back.

**D. Deterrence Considerations Do Not Weigh in Favor of a Custodial Sentence.**

a.   <u>General deterrence</u>

While general deterrence is a legitimate factor for the Court to consider in formulating a reasonable and just sentence, imposing a custodial sentence on Mr. Gilbert will not serve that end. First, the government's leniency here is a response to Mr. Gilbert's specific medical situation, rather than a comment on his conduct. But also, Mr. Gilbert was relatively low on the corporate pecking order and was not charged in his job with setting appropriate company tone

---

[3] Contrary to some of the suggestions in others' sentencing memoranda, it was not planned, nor was he acting at anyone else's direction. Instead, Mr. Gilbert acted out of frustration and a misguided impulse to alert the Steiners that someone had made the connection between them and the "Fidomaster" online identity.

and culture. Mr. Gilbert submits that imposing a higher sentence on him will not succeed in

deterring or "sending a message" to those charged with setting organizational culture, or

encouraging fulsome management training—critical areas in which eBay fell short, according to

the prosecutors who initially filed the charges in this case. *See The eBay Cyberstalking Case:*

*Mitigating the Compliance Risks of Employee Misconduct, Jones Day Talks podcast, October*

*2021*. That sort of deterrence can be effected by imposing harsh consequences on corporate

leaders or on the companies themselves—something the government did not pursue here.

Making an example of Mr. Gilbert in an effort to achieve broader corporate or societal deterrence

in fact "sends precisely the wrong message of impunity" to corporate executives: "that the

security professionals they employ will absorb all the criminal exposure for corporate

misconduct if the executives maintain a willfully blind, 'don't ask, don't tell' distance from

operational specifics, as they claim to have done here." Sentencing Memorandum of Jim Baugh,

Case No. 1:20-cr-10263-PBS, Dkt. No. 227, at 4. To be clear, Mr. Gilbert is not arguing that the

corporate culture at eBay *caused* him to take the actions he did in August 2019. To the contrary,

he takes full responsibility for his behavior and his poor choices. But because a more severe

sentence in this case is unlikely to achieve the broader deterrence goals that may be considered

under Section 3553, Mr. Gilbert avers that it should not dissuade the Court from following the

parties' recommendation in this case.

      b.    <u>Specific deterrence</u>

      There can be no reasonable question of Mr. Gilbert reoffending, and not merely because

of his prognosis. Mr. Gilbert has been profoundly affected by the events giving rise to this case

and his guilty plea. He has suffered professional humiliation through the loss of his job at eBay,

leaving him unemployed. As an individual who is accustomed to holding himself to exacting

standards and inspiring those around him, he has had to wrestle with the almost bewildering turn that his life took during his short tenure at eBay. Coming to terms with this reality has been humbling.

In addition to his own feelings of remorse, Mr. Gilbert has had to face losing the admiration and respect that he had earned over a lifetime of public service to his community. After spending his entire adult life priding himself on being one of the "good guys," Mr. Gilbert's grave errors in judgment have undoubtedly undermined his standing with everyone he interacted with over the course of his career, most notably his former colleagues in law enforcement who cannot fathom that he lied to Natick PD as part of this scheme. He has also had to repair the damage to his marriage and endure the reaction of his children and other family members.

Mr. Gilbert's thinking about these events have also been significantly impacted by his terminal diagnosis. Mr. Gilbert has struggled with what he has done with the unique perspective and clarity of someone who is grappling with his own mortality. Indeed, those who know Mr. Gilbert have opined that the degree of shame and remorse he feels has had a deleterious effect on his health and his cancer treatment. *See* Ex. 1, p. 10 (Letter of Karen Dodd) ("I know without a doubt that the emotional stress from his personal torment of knowing his wrong doing has contributed to his physical illness of cancer."); *id.*, at p. 8 (Letter of Sepideh Gilbert) (Mr. Gilbert's medical condition has caused additional levels of remorse).

Mr. Gilbert knows that what he wants to be remembered for is the many years of service for which he was rightfully proud for most of his adult life. He is deeply disappointed that he has tarnished his reputation in this way. This is not the legacy that he wanted to pass on to his three children.

### E.  A Monetary Fine Is Unwarranted And Would Only Punish Mr. Gilbert's Innocent Family Members.

A monetary fine is unwarranted under these tragic circumstances. As chronicled above, Mr. Gilbert's ongoing battle with cancer has already cost him and his family dearly—including financially. To pay for his ongoing medical expenses associated with his array of treatments, Mr. Gilbert has already had to take out a home equity line of credit and borrow $30,000 from his 77-year-old mother. *See* Kane Decl., ¶ 6.

More importantly, a fine would simply exacerbate the financial hardship already looming over Mr. Gilbert's wife—a substitute teacher, faced with the prospect of having to raise her three children as a widow, having lost her life partner of 25 years. A fine under these circumstances would do nothing to "provide just punishment" or "afford adequate deterrence." U.S.S.G. § 5E1.2(d)(1). Rather, this is a unique case in which the "the burden that the fine places on … dependents" counsels strongly *against* imposing any fine at all. *Id.* § 5E1.2(d)(3); *see also id.* § 5E1.2(d)(8) (court "shall consider … any other pertinent equitable considerations"). Mr. Gilbert therefore asks that the Court decline to impose a fine in connection with its sentence.

### IV.  CONCLUSION

For all the reasons set forth above, Mr. Gilbert requests that the Court impose the non-custodial sentence urged by the parties in this exceptional circumstance.


Respectfully submitted,


BRIAN GILBERT
Defendant


*/s/ Miranda Kane*
MIRANDA KANE
Conrad | Metlitzky | Kane LLP
217 Leidesdorff
San Francisco, California 94111

16

*/s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Libby Hoopes Brooks & Mulvey, P.C.
260 Franklin Street, Boston, MA 02110
(617) 338-9300
dbrooks@lhbmlegal.com

Dated: July 12, 2024

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on July 12, 2024.


<u>*/s/ Douglas S. Brooks*</u>
Douglas S. Brooks